1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CHANTELL GOSZTYLA,

Petitioner,

v.

PALLERES, Warden of CCWF,

Respondent.

No. 2:22-cv-00900-WBS-CSK

FINDINGS AND RECOMMENDATIONS

Petitioner is a state prisoner, proceeding without counsel, with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges her 2018 conviction for multiple sexual offenses against a minor, for which she was sentenced to a prison term of 91 years. This matter is fully briefed. After careful review of the record, this Court concludes that the petition should be denied.

I.    PROCEDURAL BACKGROUND

A. State Court History

On November 5, 2018, in the Sacramento County Superior Court, petitioner was convicted of multiple oral copulation and lewd and lascivious acts against a child in violation of Cal. Penal Code §§ 288(a) and 288.7(b). (ECF No. 31-1 at 90-91.)[1]  On December 17, 2018,

---

[1] Record citations refer to CM/ECF page numbers assigned by the Court's docketing system.

1  petitioner was sentenced to 91 years in prison: a determinate term of 16 years and an

2  indeterminate term of 75 years to life. (ECF No. 31-1 at 95.)

3       Petitioner appealed her conviction. (ECF No. 31-10.)  She raised the following issues in

4  her brief on appeal: (1) the admission of Child Sexual Abuse Accommodation Syndrome

5  ("CSAAS") expert testimony violated petitioner's right to due process and state law; (2) jury

6  instruction on expert testimony CSAAS violated petitioner's right to due process and state law;

7  (3) trial counsel provided ineffective assistance in failing to object to CSAAS expert testimony;

8  (4) cumulative error violated petitioner's right to due process; and (5) abstract of judgment

9  required correction as to fines and fees. (ECF No. 31-10 at 3-5.)  Petitioner also joined in the

10  following claim raised in her co-defendant's appeal: (6) prosecutor committed prejudicial

11  misconduct when she suggested jury should not apply the "reasonable doubt" standard because

12  petitioner was a child molester. (See ECF No. 20 at 9; ECF No. 30-13 at 29-30.)  On February 18,

13  2021, the California Court of Appeal affirmed the judgment in a reasoned opinion, though it

14  corrected the abstract of judgment. (ECF No. 31-13.)

15       Petitioner filed a petition for review in the California Supreme Court, seeking review of

16  her appellate Claims (1), (2), and (3) and also arguing that (6) the prosecutor committed

17  misconduct in the closing argument, as raised in the joint appeal with her co-defendant. (ECF No.

18  31-14.)  The Court denied the petition on May 26, 2021. (ECF No. 31-15.)

19       On April 7, 2022, petitioner filed a petition for habeas corpus in the Sacramento Superior

20  Court raising the following issues: (1) ineffective assistance of counsel (multiple grounds);

21  (2) trial court's abuse of discretion and prosecutorial misconduct violated petitioner's

22  constitutional rights (multiple grounds); and (3) Court of Appeal deprived petitioner of her

23  constitutional rights (multiple grounds). (ECF No. 31-16.)  The Sacramento Superior Court

24  denied petitioner's habeas petition in a reasoned opinion. (ECF No. 31-17.)  Petitioner filed a

25  petition for writ of habeas corpus in the California Court of Appeal (ECF No. 30-18), which

26  denied the petition on July 15, 2022. (ECF No. 30-19.)  Petitioner filed a petition for writ of

27  habeas corpus in the California Supreme Court (ECF No. 30-20), which was denied on September

28  21, 2022. (ECF No. 30-21.)

1     B. The Federal Petition

2         The federal petition was filed on May 17, 2022. (ECF No. 1.)  On October 20, 2022, the

3     previously-assigned Magistrate Judge appointed a Federal Defender to represent petitioner. (ECF

4     No. 10.)  The operative First Amended Petition was filed on August 16, 2023. (ECF No. 20.)

5     Petitioner raises six claims in the amended petition: (1) admission of CSAAS evidence made

6     petitioner's trial fundamentally unfair in violation of due process; (2) jury instruction on CSAAS

7     evidence violated petitioner's right to due process; (3) defense attorney rendered ineffective

8     assistance by failing to object to CSAAS testimony mirroring the facts of the case; (4) prosecutor

9     committed misconduct during closing argument; (5) prosecutor unlawfully failed to disclose

10    exculpatory evidence; and (6) petitioner's 91-year sentence is cruel and unusual under the Eighth

11    Amendment.

12        On November 3, 2023, respondent filed an answer. (ECF No. 30.) On February 1, 2024,

13    petitioner filed a reply. (ECF No. 34.)

14    II.    FACTS

15        After independently reviewing the record, this Court finds the state appellate court's

16    factual summary to be accurate and adopts it herein:[2]

17
18            The victim was born in January 2011. By early 2016, Chantell was
            divorced from the victim's father and was the victim's sole caregiver.
            While the victim had contact with her father, the contact was
19            intermittent and occurred only with Chantell's permission. The
            victim's father was required to, but did not, pay child support.

20            In February 2016, defendants were in a romantic relationship.
21            Chantell and the victim moved into Richard's parents' house with
            Richard and his mother. Richard's father was not living in the home
            because he worked far away. In September 2016, Richard's father
22            returned, and Richard's parents moved out of the house to let
            defendants and the victim live alone together. Defendants married at
23            that time but did not plan to have a wedding ceremony until the next
            year.
24

25            The victim was close to Richard's parents. She saw them once a week
            for dinner and would often spend the night with them alone. The
26            victim was also close to Chantell's parents and spent nearly every
            weekend with them, although Chantell and her parents did not get
27            along. Neither Richard's parents or Chantell's parents noticed

28    _____
      [2]   The victim is also referred to as K.D.

3

anything about the victim that would cause them to be concerned.

After Richard's parents moved, defendants started asking the victim to join them in their bedroom. Usually Chantell asked, but sometimes Richard or both defendants asked her. They always asked the victim to join in a "nice way." The victim "almost about every time" joined defendants because she wanted to spend time with them. Defendants were busy doing their own things -- Chantell studying to become a teacher and Richard playing his game -- causing the victim to not see them often. When the victim went into defendants' bedroom, defendants played with their own private parts and each other's private parts. They did it on a made-up bed, while the victim sat next to them on the bed sometimes watching her tablet. While the victim was in defendants' bedroom, she saw defendants watching other people on a computer playing with their private parts.

Usually defendants just touched themselves or each other, but sometimes they asked the victim for help by moving her hand up and down Richard's private parts while Chantell had his private parts in her mouth. The victim complied because she did not want defendants to feel bad for wanting her to join them.

Defendants also asked the victim to lick Richard's private parts. She did not want to and did not like the taste when she tried. Defendants asked if she would try again with a "gel or something." In early July 2017, defendants bought strawberry and mint lubricant. They put the strawberry gel on Richard's private parts, but the victim did not like it because it only had a "little bit of strawberry to it." She also tried licking Richard's private parts with mint gel but did not like that either.

Sometimes defendants played with the victim's body when she was in their bedroom. Richard licked the victim's private parts and touched her private parts with his finger. He used his tongue and finger in a zig-zag and it felt weird. One time, Richard licked the victim's private parts in the living room when Chantell was not there. Sometimes Chantell also kissed the victim on the victim's private parts.

In total, the victim believed she helped defendants by moving her hand up and down on Richard's private parts three or four times. She believed she put her mouth on Richard's private parts three times and Richard put his fingers on her private parts four or five times. She also believed Richard put his mouth on her private parts once or twice.[3]

In early September 2017, Chantell sent the victim to live with her father so defendants would be able to move to Southern California and establish themselves before the victim joined them there. Chantell told the victim's father that once the victim moved to Southern California, he would never see the victim again. Later that

---

[3] The above facts were summarized from the victim's trial testimony.

4

month, defendants held their wedding ceremony.

In early October 2017, the victim told her father she had a secret involving defendants. The victim's secret caused her father to contact child protective services and the Sacramento County Sheriff's Department. On October 10, 2017, defendants left for Southern California. On their way out of town, Chantell called her parents and told them any allegations they heard against her were false but that she was leaving town and would never see them again.

The victim was later interviewed at the special assault forensic evidence center. During the forensic interview, the victim said defendants often asked her to join them in their bedroom when she was playing alone. It seemed they wanted to spend time with her. Sometimes Chantell would ask the victim, sometimes, Richard. The victim said that because she wanted to spend time with defendants, she joined them in their bedroom, but sometimes with her tablet. When she went into defendants' bedroom, they usually got naked and touched each other's private parts. The victim said defendants also watched videos on Richard's computer of teenagers and grownups doing the same thing defendants did. The victim said she usually sat or lie on the bed with defendants while defendants touched each other. Sometimes the victim was naked, sometimes she was not.

During the forensic interview, the victim said sometimes defendants asked her if she wanted to help. They asked her to put her mouth on Chantell's private parts, but she did not want to. Sometimes Chantell put her mouth on Richard's private parts and the victim would help make his private parts go "up and down -- up and down." The victim said defendants also asked her to lick Richard's private parts, but when she tried, she did not like it. So defendants bought strawberry paste and mint paste, but the victim still did not like doing it. The victim further said Chantell told her she did not have to lick Richard's private parts if she did not like it, but Richard told her she may try it when she was older.

During the forensic interview, the victim also said Richard sometimes put his tongue and finger on the part of her body she used to go to the bathroom. She was naked when Richard did this. When using his finger, Richard would make a circle. The victim said Richard put his mouth on her private parts once while he and the victim were in the living room together without Chantell. Once, Chantell touched the victim's private parts and kissed it too.

During the forensic interview, the victim said she believed she moved Richard's private parts up and down twice. She believed she licked his private parts three times. She believed Richard put his mouth on her private parts one or two times and touched her private parts with his finger four or five times. The victim said defendants told her not to tell anybody because it was "private."

After spending time in Southern California, defendants spent the next several months traveling around the United States staying with family and working for employers that provided room and board.

5

During this time, the victim's father was involved in family court proceedings with Chantell. He also moved with the victim out of state, causing a custody dispute between Chantell's parents and the victim's father. The victim's father did not always appear for family court hearings and disobeyed some family court rulings. In March 2018, defendants were arrested in Napa.

A search of defendants' electronic devices revealed that between July 2016 and March 2018, defendants searched and watched a lot of lawful pornography. A portion of that lawful pornography included videos entitled: "Daughter watches mom suck dad's dick"; "Mom teaches daughter to suck dad's dick"; "First time stroking a cock"; "Mommy fucks daddy in front of daughter"; "Daughter learning how to suck daddy cock"; "Mom and dad seduce daughter"; "Daughter sucking dad"; "Family forced abuse"; "Mom and dad incest with daughter"; "Daddy rubs daughter's pussy"; "Daughter learns to suck daddy's cock"; "Mom and dad teach daughter how to fuck"; "Mom teaches daughter blow job"; "Daughter sucks dad's cock"; "Daughter sucks daddy for the first time"; "Mom and dad use daughter like little slut"; "Daughter takes daddy's pants off and sucks"; "Daughter and mom suck on daddy"; "Super Horny daughter Wants Step-daddy"; "Tiny baby takes down a massive cock"; "Daughter fucks daddy porn"; "Wife holds daughter down"; "Daughter used by dad"; "Daughter riding dad"; and "Daddy touches daughter." (Italics omitted.)[4]

At trial, Chantell testified the victim had occasionally walked in on her and Richard engaging in oral sex and intercourse, during which defendants watched pornography. Chantell testified defendants had a very active sex life and watched a lot of pornography of varying types, including that contained in their search history and read to the jury. Chantell testified she and Richard searched those particular topics because the women who appear in father-daughter, role-play pornography typically match Chantell's petite body type.

Chantell testified that while the victim's father believed Chantell was going to keep him from seeing the victim, Chantell had no intention of doing so. She further testified that in early October 2017, the victim's father did not answer her calls or let her speak to the victim. Chantell later learned of the victim's allegations and believed it was the victim's father saying these things to get custody of the victim. Chantell testified that the victim's father coached the victim "to say she's been a part of activities that she has not been a part of." He further wanted custody of the victim so he could move with his new family out of state. Chantell testified that nobody in the family court system or child protective services ever told Chantell how to fight the allegations made by the victim. Chantell's plan was always to save money and fight to regain custody of the victim when she could afford it.

A jury found defendants guilty of multiple counts of oral copulation with a child under the age of 14 years and lewd and lascivious acts

---

[4] One title for nearly every month between July 2016 and March 2018, was read into evidence. Defendants searched numerous other times for similar content.

> on a child under the age of 14 years. The jury further found
> defendants had substantial sexual contact with a child under the age
> of 14 years. The trial court sentenced each defendant to a total of 75
> years to life plus 16 years. It further imposed various fines and fees.
>
> Defendants appeal.

People v. Gosztyla, Case No. C088530  (Feb. 18, 2021) (ECF No. 31-13).

III.    STANDARDS FOR A WRIT OF HABEAS CORPUS UNDER ANTITERRORISM

AND EFFECTIVE DEATH PENALTY ACT ("AEDPA")

An application for a writ of habeas corpus by a person in custody under a judgment of a

state court can be granted only for violations of the Constitution or laws or treaties of the United

States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation

or application of state law. See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502

U.S. 62, 67-68 (1991).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas

corpus relief:

> An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be granted
> with respect to any claim that was adjudicated on the merits in State
> court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal
> law, as determined by the Supreme Court of the United
> States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence
> presented in the State court proceeding.

28 U.S.C. § 2254(d).

For purposes of applying § 2254(d)(1), "clearly established Federal law" consists of

holdings of the Supreme Court at the time of the last reasoned state court decision. Thompson v.

Runnels, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing Greene v. Fisher, 565 U.S. 34, 39-40

(2011)); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S.

362, 412 (2000)). Circuit court precedent "may be persuasive in determining what law is clearly

established and whether a state court applied that law unreasonably."  Stanley, 633 F.3d at 859

1   (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)). However, circuit precedent may not

2   be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific

3   legal rule that th[e] [Supreme] Court has not announced."  Marshall v. Rodgers, 569 U.S. 58, 64

4   (2013) (citing Parker v. Matthews, 567 U.S. 37, 48-49 (2012) (per curiam)). Nor may it be used to

5   "determine whether a particular rule of law is so widely accepted among the Federal Circuits that

6   it would, if presented to th[e] [Supreme] Court, be accepted as correct. Id. Further, where courts

7   of appeals have diverged in their treatment of an issue, there is no "clearly established federal

8   law" governing that issue. See Carey v. Musladin, 549 U.S. 70, 77 (2006).

9       A state court decision is "contrary to" clearly established federal law if it applies a rule

10  contradicting a holding of the Supreme Court or reaches a result different from Supreme Court

11  precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003).

12  Under the "unreasonable application" clause of § 2254(d)(1), "a federal habeas court may grant

13  the writ if the state court identifies the correct governing legal principle from [the Supreme

14  Court's] decisions, but unreasonably applies that principle to the facts of the prisoner's case."[5]

15  Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (quoting Williams, 529 U.S. at 413); see also Chia v.

16  Cambra, 360 F.3d 997, 1002 (9th Cir. 2004). In this regard, "a federal habeas court may not issue

17  the writ simply because that court concludes in its independent judgment that the relevant state-

18  court decision applied clearly established federal law erroneously or incorrectly. Rather, that

19  application must also be unreasonable."  Williams, 529 U.S. at 411; see also Schriro v. Landrigan,

20  550 U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 ("It is not enough that a federal habeas court,

21  in its independent review of the legal question, is left with a firm conviction that the state court

22  was erroneous") (internal quotations and citation omitted). "A state court's determination that a

23  claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on

24  the correctness of the state court's decision."  Harrington v. Richter, 562 U.S. 86, 101 (2011)

25  (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for

26  ─────────────────────────

27  [5]  Under § 2254(d)(2), a state court decision based on a factual determination is not to be
    overturned on factual grounds unless it is "objectively unreasonable in light of the evidence
    presented in the state court proceeding."  Stanley, 633 F.3d at 859 (quoting Davis v. Woodford,

28  384 F.3d 628, 638 (9th Cir. 2004)).

8

1  obtaining habeas corpus from a federal court, a state prisoner must show that the state court's

2  ruling on the claim being presented in federal court was so lacking in justification that there was

3  an error well understood and comprehended in existing law beyond any possibility for fair-

4  minded disagreement." Id. at 103.

5      If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

6  court must conduct a de novo review of a habeas petitioner's claims. Delgadillo v. Woodford, 527

7  F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en

8  banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1)

9  error and that, if there is such error, we must decide the habeas petition by considering de novo

10  the constitutional issues raised.").

11      The court looks to the last reasoned state court decision as the basis for the state court

12  judgment. Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). If

13  the last reasoned state court decision adopts or substantially incorporates the reasoning from a

14  previous state court decision, this court may consider both decisions to ascertain the reasoning of

15  the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a

16  federal claim has been presented to a state court and the state court has denied relief, it may be

17  presumed that the state court adjudicated the claim on the merits in the absence of any indication

18  or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. This presumption

19  may be overcome by a showing "there is reason to think some other explanation for the state

20  court's decision is more likely." Id. at 99-100. Similarly, when a state court decision on

21  petitioner's claims rejects some claims but does not expressly address a federal claim, a federal

22  habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the

23  merits. Johnson v. Williams, 568 U.S. 289, 298-301 (2013) (citing Richter, 562 U.S. at 98). If a

24  state court fails to adjudicate a component of the petitioner's federal claim, the component is

25  reviewed de novo in federal court. See, e.g., Wiggins v. Smith, 539 U.S. 510, 534 (2003).

26      Where the state court reaches a decision on the merits but provides no reasoning to

27  support its conclusion, a federal habeas court independently reviews the record to determine

28  whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v.

1  Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo

2  review of the constitutional issue, but rather, the only method by which we can determine whether

3  a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853. Where no

4  reasoned decision is available, the habeas petitioner has the burden of "showing there was no

5  reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98.

6       A summary denial is presumed to be a denial on the merits of the petitioner's claims.

7  Stancle v. Clay, 692 F.3d 948, 957 & n.3 (9th Cir. 2012). While the federal court cannot analyze

8  just what the state court did when it issued a summary denial, the federal court reviews the state

9  court record to "determine what arguments or theories . . . could have supported the state court's

10  decision; and then it must ask whether it is possible fairminded jurists could disagree that those

11  arguments or theories are inconsistent with the holding in a prior decision of [the Supreme]

12  Court." Richter, 562 U.S. at 101. It remains the petitioner's burden to demonstrate that 'there was

13  no reasonable basis for the state court to deny relief.'" Walker v. Martel, 709 F.3d 925, 939 (9th

14  Cir. 2013) (quoting Richter, 562 U.S. at 98).

15       When it is clear, however, that a state court has not reached the merits of a petitioner's

16  claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

17  habeas court must review the claim de novo. Stanley, 633 F.3d at 860 (citing Reynoso v.

18  Giurbino, 462 F.3d 1099, 1109 (9th Cir. 2006)).

19  IV.   DISCUSSION

20       A.  Claim One: Admission of Expert Testimony on CSAAS

21       Petitioner claims that her right to due process and a fair trial under the Fourteenth

22  Amendment was violated when the trial court admitted expert testimony on Child Abuse

23  Accommodation Syndrome. Petitioner contends this testimony was speculative, unreliable, and

24  prejudicial for the following reasons: The child abuse allegations in this case took place in the

25  context of a custody dispute[6], with no physical evidence corroborating K.D.'s accusations. Thus,

26

27  [6] At trial, petitioner testified that she believed K.D.'s father filed a Child Protective Services report alleging sexual abuse by petitioner and Richard in order to get custody of K.D. (ECF No.

28  31-6 at 18-19, 29.)

1    K.D.'s credibility was the key issue for the jury. Petitioner contends that CSAAS is a

2    "pseudoscientific theory" that serves to explain away indicia that a child's testimony about sexual

3    abuse is not credible, "virtually ensur[ing] a guilty verdict" in a case that rests entirely on the

4    jury's evaluation of the child's credibility. (ECF No. 34 at 6-7.) Petitioner contends that the

5    admission of this testimony deprived her of the right to a fundamentally fair trial as established in

6    Chambers v. Mississippi, 410 U.S. 284, 302-03 (1973). Petitioner notes that some state courts

7    have rejected CSAAS evidence. See, e.g., State v. J.L.G., 234 N.J. 265, 272 (2018) (New Jersey

8    Supreme Court holding that "CSAAS in general, and its component behaviors other than delayed

9    disclosure, may no longer be admitted at criminal trials" due to insufficient scientific basis). But

10   see Aroz v. Covello, 2024 WL 3792388, at *47 (E.D. Cal. Aug. 13, 2024) ("California courts

11   have rejected reliability challenges to CSAAS evidence based on citations to State v. J.L.G.")

12   (collecting cases). Finally, petitioner argues that, under California law, CSAAS testimony is a

13   means of "rehabilitat[ing] a witness' credibility" after a delay in reporting or similar conduct

14   seemingly inconsistent with being molested. People v. McAlpin, 53 Cal. 3d 1289, 1300-01

15   (1991). In this case, petitioner argues, there was no issue of delayed reporting or other credibility-

16   undermining behavior by the victim. Thus, the CSAAS testimony did not serve to "rehabilitate"

17   the victim's testimony but merely bolster its credibility, violating petitioner's right to a fair trial.

18        In response, respondent argues that the state court reasonably rejected petitioner's claim

19   against the CSAAS evidence, and no clearly established Supreme Court precedent dictates a

20   contrary result.

21        Before trial, petitioner through counsel moved to exclude CSAAS testimony by an expert

22   witness. (ECF No. 31-1 at 29.) Petitioner argued that such testimony was inadmissible scientific

23   evidence under Frye v. United States, 293 F. 1013 (1923) and People v. Kelly, 17 Cal. 3d. 24

24   (1976). (ECF No. 31-1 at 40-41.) Petitioner's co-defendant (hereinafter "Richard") also moved to

25   suppress the CSAAS evidence and requested a pretrial hearing to determine its reliability and

26   admissibility. (ECF No. 31-1 at 120-121.) The trial court declined to hold a pretrial hearing on the

27   CSAAS evidence and denied the motion without prejudice to renewal. (ECF No. 31-3 at 36-37.)

28        At trial, Richard moved to exclude all CSAAS testimony in the case. (ECF No. 31-1 at

1   131-145.) Petitioner joined in the motion. (ECF No. 31-5 at 34.) The trial court ruled the

2   proposed testimony was "appropriate in a case of this sort. CSAAS testimony is valid and

3   recognized, and it will be permitted . . . limited to the four corners of CSAAS, not [getting] into

4   data or studies relative to false allegations[.]" (ECF No. 31-5 at 39-41.) The state's CSAAS

5   expert, Dr. Blake Carmichael, proceeded to testify as summarized in the Court of Appeal's

6   opinion, below. (ECF No. 31-5 at 44-92.)

7       The California Court of Appeal issued the last reasoned state court decision addressing

8   this claim. The California Court of Appeal denied this claim for the following reasons:

9

10                      *Claims Related To Accommodation Syndrome*

11          In <u>McAlpin</u>, our Supreme Court said, "[E]xpert testimony on the
        common reactions of child molestation victims is not admissible to
12          prove that the complaining witness has in fact been sexually abused;
        it is admissible to rehabilitate such witness's credibility when the
13          defendant suggests that the child's conduct after the incident -- e.g.,
        a delay in reporting -- is inconsistent with his or her testimony
14          claiming molestation. [Citations.] 'Such expert testimony is needed
        to disabuse jurors of commonly held misconceptions about child
15          sexual abuse, and to explain the emotional antecedents of abused
        children's seemingly self-impeaching behavior.'" (<u>People v.</u>
16          <u>McAlpin</u> (1991) 53 Cal.3d 1289, 1300-1301 [discussing with
        approval Court of Appeal opinions admitting accommodation
17          syndrome expert testimony to support its holding expert may explain
        why the parent of a sexually molested child would not report the
18          abuse]; <u>accord</u>, <u>People v. Patino</u> (1994) 26 Cal.App.4th 1737, 1744
        [accommodation syndrome evidence is admissible for "the limited
19          purpose of disabusing a jury of misconceptions it might hold about
        how a child reacts to a molestation"]; <u>People v. Housley</u> (1992) 6
20          Cal.App.4th 947, 957 [accommodation syndrome evidence was
        admissible to explain child's delay in reporting rape and later
21          recantation of charges, explaining this evidence "may -- with certain
        limitations -- be used to disabuse the jury of common misconceptions
22          concerning abuse victims"].) In California, "it has long been held that
        in a judicial proceeding presenting the question whether a child has
23          been sexually molested, [testimony regarding accommodation
        syndrome] is admissible evidence for the limited purpose of
24          disabusing the fact finder of common misconceptions it might have
        about how child victims react to sexual abuse." (<u>In re S.C.</u> (2006)
25          138 Cal.App.4th 396, 418.)

26          Defendants raise several claims related to accommodation syndrome.
        Defendants request we revisit the long-established rule that
27          accommodation syndrome evidence is admissible to disabuse jurors
        of common misconceptions. They further argue the trial court abused
28          its discretion under their particular circumstances. Defendants also
        attack their attorneys' performance arguing they were ineffective by

                                        12

failing to object to several of the prosecutor's improper hypothetical questions posed to the accommodation syndrome expert. Finally, defendants argue the trial court improperly instructed the jury on the purpose of accommodation syndrome evidence. We disagree with each of defendants' contentions.

## A

### *Background*

The trial court admitted accommodation syndrome evidence over defendants' objections.

The accommodation syndrome expert testified about the history and clinical application of accommodation syndrome. He testified that accommodation syndrome was first mentioned by Dr. Roland Summit and his research team in the early 1980's. "And in their work they found that kids who had been sexually abused were doing things and saying things that a lot of people didn't anticipate or wouldn't expect. So people had expectations about how kids would act or how they would tell about being sexually abused, and what he was finding, and that group was finding, treating these kids is that wasn't always the case. So he wrote -- he and his colleagues took a lot of information from their caseloads and presented this concept of ... Child Sexual Abuse Accommodation Syndrome, to help educate people about kids who we know were sexually abused to kind of demystify this group of kids that most people didn't know about and to challenge some misconceptions or to correct some misconceptions that people had about this general population of kids." The intention of the article was to educate people who came in contact with victims of child sexual abuse, such as therapists, social workers, law enforcement, and legal professionals. Dr. Summit did not do research to come to his conclusions; instead, he observed patterns among the patients in his clinics and then wrote about it.

Accommodation syndrome consists of five components. The first is secrecy and is founded upon the understanding that child sexual abuse occurs within the context of a relationship. "[W]e can't look at child sexual abuse as an act. We don't look at the abusive act in isolation. It's occurring within the context of a relationship that the child has with their perpetrator, and this is often -- most often a trusting, loving, caring relationship that the child has with their perpetrator, where the person has ongoing access, continued sexual access to the child." Perpetrators can gain secrecy through threats and punishment or by the simple fact that they also provide emotional support and the victim would feel guilty being the cause of the perpetrator going to jail.

After discussing this concept, the prosecutor asked the following hypothetical: "For example, can the perpetrator say, This is our secret or Don't tell anyone. This is private business between us?" The expert responded, "That can absolutely happen. In fact, there's research done by a Conte and Wolf, Elliot, a lot of different people with regards [sic] to perpetrators. [¶] And what they have talked

about is that keeping it a secret or saying, I will keep a secret, or being told this is private, kids trust adults and they look to adults to kind of learn the rules of intimacy and relationship building. So if someone agrees to keep something a secret, that is your word, and it's important to keep your word."

The expert then moved on to the second component, which is helplessness. This component "speaks to the fact that most kids don't bite, kick and scream to get away from their perpetrator. The idea of helplessness is really within that relationship. You have a bigger, stronger, older, more sophisticated perpetrator, and you have a younger, smaller, vulnerable, certainly less sophisticated child that looks up to their perpetrator, and so the idea of them standing up to this person with more power leaves them in this helpless position, because they really can't combat a lot of sophistication, size, influence that the perpetrator has. [¶] So if the child is then being abused by the person [who] is supposed to protect them, physically, sexually, emotionally, that helplessness grows even more. And if the child feels they can't tell someone or be believed in their immediate environment or even if someone is close by because they are fearful of telling that person, that helplessness grows even more."

Following this discussion, the prosecutor asked the following hypothetical: "So do I understand you correctly: If a child is hypothetically being abused by someone who is familiar to them, in a loving position, that that helplessness can actually increase because of the relationship that the child has with the perpetrator or the perpetrators?" As part of the expert's response, he said the research supported an inference that the closer the relationship between the victim and the perpetrator, the harder it can be to disclose abuse to others. The prosecutor then asked whether this dynamic increased if the perpetrators were basically "teaching the child to engage in sexual acts?" The expert agreed, testifying that a reason a victim may not kick and scream to get away from their perpetrators is because they do not realize the touching is inappropriate. "[I]f a legitimate authority is teaching you to do certain things and you trust that person, that this is an okay thing to do or it's normal for us to do this, there may not even be a reason to tell about it, and that can leave that child even more helpless to be protected, because they are not talking about the inappropriateness; one, not being aware of it possibly, and two, It's just the way this relationship works, and, it's a relationship I care about and like."

The expert then moved on to the third component, which is entrapment and accommodation. This component accounts for a child victim's coping mechanisms in his or her life to adjust to the abusive relationship. This can manifest itself in physical changes, such as avoiding certain rooms in the house or wearing an extra pair of pajamas. There are also emotional or cognitive things child victims can do to cope, such as repress feelings of guilt, shame, and fear, as well as disassociate from reality during the abusive conduct.

After this discussion, the prosecutor asked the following hypothetical: "Can children accommodate or cope by actually going along with the abuse that's happening and participate in it?" The

14

expert agreed they could and testified that many children in his practice go along with the abuse to make it stop or from fear something worse will happen. The prosecutor followed up by asking, "Would you consider if a child wanted to please their abusers, is that fitting into the coping mechanism that you, in your training and experience as well as Dr. Summit's observations, does that fit into what we would call coping or accommodation?" The expert believed it did, explaining that victims may be seen as wanting to please the abuser because the abusive conduct is occurring within a relationship where a child often wants the abuser to be proud of them. The child further knows that this conduct makes the abuser proud so the child will engage in it to make the abuser proud.

The fourth component of accommodation syndrome is delayed and unconvincing disclosure. This component accounts for the reality that most child victims of sexual abuse do not tell someone about it right away; in fact, only 20 percent will report within the first month, with 40 to 60 percent of victims reporting within the first year. Unconvincing or conflicting disclosure is a result of a child's development and memory. "And so a lot of times people expect or want to have information given to them consistently in the same way each time they are told about it to be convinced of it. Kids don't work that way. Memory does not work that way. [¶] And so it's not uncommon for kids to be inconsistent or unconvincing in the way that they talk about being abused. [¶] Some of that is related to emotional display. A lot of times people expect kids to appear sad or angry or just horrified if they are talking about sexual abuse."

After this discussion, the prosecutor asked the expert the following hypothetical: "[B]ased on your training and experience and the research that you are aware of, do children disclose when they eventually feel safe and they are out of -- out of the relationship with the perpetrator?" The expert responded, "[W]hen kids feel like they are going to be heard, when they feel like they are going to be supported and, say, believed, those are conditions where kids will be more likely to tell." The expert continued, "So really it does often become when the child is removed from that relationship or far more distance from having ongoing access to that person, we might see kids more comfortable talking about it."

Finally, the fifth component of accommodation syndrome is retraction. The expert explained that studies show between 16 and 22 percent of legitimate victims of child sexual abuse retract their allegations, representing a "minority" of cases.

B

*Accommodation Syndrome Evidence Is Not Inadmissible As A Matter Of Law*

Defendants contend expert evidence regarding accommodation syndrome is irrelevant and unduly prejudicial as a matter of law because it is no longer common for jurors to hold the misconceptions

15

addressed by the expert's testimony and the evidence is likely to be used as evidence of guilt. As support, defendants cite to a research study " 'suggesting that laypeople tend to believe that delayed disclosure is common' " among child sexual abuse victims. They also point to out-of-state cases for the propositions that jurors are equipped to understand the concepts underlying accommodation syndrome without the assistance of expert testimony and accommodation syndrome evidence is likely to be unduly prejudicial. We review this claim de novo. (People v. Gonzales (2018) 6 Cal.5th 44, 49 [questions of law reviewed de novo].)

We decline defendants' invitation to deviate from McAlpin and its progeny. (Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455 [appellate courts must follow California Supreme Court decisions].) . . .

We likewise reject defendants' argument that accommodation syndrome evidence is inadmissible because the sexual molestation of children no longer falls outside the common experience of jurors. We cannot assume from the research study defendants cite or the advancement in technology and communication since McAlpin that the average juror is familiar with the behavior of child victims of sex crimes, or that expert testimony on the subject would be unhelpful to the jury. (See People v. McAlpin, supra, 53 Cal.3d at pp. 1299-1300 [even when the jury has some knowledge of the subject matter, expert opinion may be admitted whenever it would assist the jury].) Accordingly, testimony related to accommodation syndrome is not inadmissible as a matter of law.

C

*The Trial Court Did Not Abuse Its Discretion By Admitting Accommodation Syndrome Evidence*

Defendants argue the court erred by admitting accommodation syndrome evidence because the prosecution made no showing defendants' jury held misconceptions related to child sexual abuse victims. We review the trial court's decision to admit specific accommodation syndrome evidence for an abuse of discretion. (People v. Powell (2018) 6 Cal.5th 136, 162 [rulings on admissibility of evidence reviewed for an abuse of discretion].)

Initially, we note the prosecutor was not required to show defendants' jury held misconceptions related to the behavior of child sexual abuse victims before seeking admission of accommodation syndrome evidence. Accommodation syndrome evidence is admissible "to rehabilitate [a child] witness's credibility when the defendant suggests that the child's conduct after the incident -- e.g., a delay in reporting -- is inconsistent with his or her testimony claiming molestation." (People v. McAlpin, supra, 53 Cal.3d at pp. 1300-1301.)

Here, defendants' defense was that the victim fabricated the sexual abuse at the behest of her father so he could take her out of state to

16

> live with him and his new family. To prove this, defendants pointed to the closeness of their relationship with the victim until she went to live with her father. Because defendants asserted the victim's conduct was inconsistent with her allegations of abuse, accommodation syndrome evidence was admissible to rehabilitate the victim's credibility. Accordingly, the trial court did not abuse its discretion.

(ECF No. 30-13 at 15-22.)

"Under AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court." Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) (quoting 28 U.S.C. § 2254(d)). The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." Holley, 568 F3d. at 1101; see also Greel v. Martel, 472 F. App'x 503, 504 (9th Cir. 2012) ("There is ... no clearly established federal law that admitting prejudicial evidence violates due process."). Moreover, there is no clear Supreme Court authority holding that admission of expert testimony concerning an ultimate issue to be decided by the jury violates the Constitution. Moses v. Payne, 555 F.3d 742, 761–62 (9th Cir. 2009) (trial court's decision to admit expert testimony "was not contrary to or an unreasonable application of Supreme Court precedent").

As to CSAAS evidence specifically, "[t]here is no 'clearly established federal law' that the admission of CSAAS evidence in a child molestation case violates the due process clause." Mairena v. Jones, 2025 WL 808140, at *10 (E.D. Cal. Mar. 13, 2025) (findings and recommendations adopted by district judge Sep. 10, 2025) (quoting Otero v. Diaz, 2020 WL 7406517, at *10 (E.D. Cal. Dec. 17, 2020)). The Supreme Court has never found CSAAS or similar testimony to violate a petitioner's due process rights. See Amaya v. Frauenheim, 823 Fed. Appx. 503 (9th Cir. 2020) (no clearly established federal law that CSAAS testimony violates due process). The Ninth Circuit has upheld the use of CSAAS evidence in child abuse cases against due process challenges "when the testimony concerns general characteristics of victims and is not used to opine that a specific child is telling the truth." Harlow v. People of State of California, 2021 WL 1388266, at *17 (E.D. Cal. Apr. 13, 2021) (quoting Brodit v. Cambra, 350 F.3d 985,

991 (9th Cir. 2003)). Thus, the trial court's admission of Dr. Carmichael's testimony was not contrary to, or an unreasonable application of, clearly established Supreme Court authority. Petitioner's expert testimony claim should be denied.

     B.  <u>Claim Two: Jury Instruction on CSAAS Testimony</u>

     Related to Claim One, petitioner claims that her right to due process and a fair trial under the Fourteenth Amendment was violated when the trial court instructed the jury to use CSAAS testimony to evaluate K.D.'s credibility.

     As to the CSAAS evidence, the jury was instructed with CALCRIM No. 1193, as follows:

> You have heard testimony from [an expert] regarding Child Sexual Abuse Accommodation Syndrome. [The expert]'s testimony about Child Sexual Abuse Accommodation Syndrome is not evidence that the Defendant committed any of the crimes charged against him or her. You may consider this evidence only in deciding whether or not [the victim]'s conduct was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of her testimony.

(ECF No. 31-7 at 200-201.)

     In closing argument to the jury, the prosecutor made the following statements with respect to CSAAS evidence:

> Dr. Carmichael came and talked to you. He talked to you about what we call CSAAS, Child Sexual Assault Accommodation Syndrome. It's not a diagnosis. The are gonna tell you that. Again, it's not a diagnosis. It's an educational tool. It was developed for therapists and for other people working for children.
>
> Dr. Carmichael came in here and he talked to you about that general understanding of how kids may act if they have been molested or abused, and he talked to you about these different components.
>
> You can use that information to help you in deciding what happened in this case. It's not a mental health diagnosis. It's not a checklist. It's not in the DSM-V like pedophilic disorder. It's not in the DSM-V. It's an educational tool, and that's why it was presented, and hopefully it gave you some insight about how – an understanding of how kids may, may act if they have been abused.

(ECF No. 31-7 at 108-109.)

///

1          In the last reasoned state court decision addressing this claim, the California Court of

2    Appeal denied it for the following reasons:

3                *The Trial Court Properly Instructed With CALCRIM No. 1193*

4                Defendants contend the trial court erred by instructing the jury with
     CALCRIM No. 1193 regarding the proper use of accommodation
5                syndrome evidence. Specifically, defendants argue the court's
     instruction allowed the jury to use accommodation syndrome
6                evidence to assess the truth of the victim's claims, contrary to case
     law. (See People v. Housley, supra, 6 Cal.App.4th at p. 959 ["in all
7                cases in which an expert is called to testify regarding
     [accommodation syndrome] we hold the jury must sua sponte be
8                instructed that ... the expert's testimony is not intended and should
     not be used to determine whether the victim's molestation claim is
9                true"].) We review de novo the question of whether a jury instruction
     correctly states the law. (People v. Posey (2004) 32 Cal.4th 193,
10               218.)

11               [Text of CALCRIM No. 1193 omitted.]

12               Defendants' claim was rejected in People v. Gonzales (2017) 16
     Cal.App.5th 494. We agree with that court that "[t]he purpose of
13               [accommodation syndrome evidence] is to understand a child's
     reactions when [he or she] ha[s] been abused. [¶] A reasonable juror
14               would understand CALCRIM No. 1193 to mean that the jury can use
     [the expert's] testimony to conclude that [the child's] behavior does
15               not mean she lied when she said she was abused. The jury also would
     understand it cannot use [the expert's] testimony to conclude [the
16               child] was, in fact, molested. The [accommodation syndrome]
     evidence simply neutralizes the victim's apparently self-impeaching
17               behavior. Thus, under CALCRIM No. 1193, a juror who believes
     [the expert's] testimony will find both that [the child's] apparently
18               self-impeaching behavior does not affect her believability one way
     or the other, and that the [accommodation syndrome] evidence does
19               not show she had been molested. There is no conflict in the
     instruction." (Gonzales, at p. 504; accord, People v. Munch, supra,
20               52 Cal.App.5th at p. 474.)

21               Defendants disagree arguing the instruction's biggest flaw is that it
     fails to inform the jury it cannot use accommodation syndrome
22               evidence to determine whether the victim's claim is true. But the
     instruction informs the jury accommodation syndrome evidence "is
23               not evidence that the Defendant committed any of the crimes charged
     against him or her," i.e., whether the allegations are true. Defendants
24               equate credibility of a witness with truth of an allegation. Those
     concepts are not the same, especially where, as here, the jury was
25               instructed it must not consider this evidence when determining guilt.
     Indeed, the jury was instructed it must consider all the evidence when
26               making that determination, excluding accommodation syndrome
     evidence. We presume the jury followed these instructions. (See
27               People v. Smith (2007) 40 Cal.4th 483, 517 [" '[t]he crucial
     assumption underlying our constitutional system of trial by jury is
28               that jurors generally understand and faithfully follow instructions'

                                        19

1    "].)

2    Defendants further argue the effect of the instruction is that the jury
     will always view a victim's past conduct as confirming the victim's
3    credibility. This is particularly prejudicial when often that conduct,
     e.g. family interactions, is the only evidence a defendant can use to
4    impeach a victim. We disagree. CALCRIM No. 1193 does not tell
     the jury it can use accommodation syndrome evidence to corroborate
5    the victim's testimony. Instead, the instruction informs the jury that
     the victim's conduct may not be probative to credibility regarding
6    her allegations of sexual abuse. Accordingly, the trial court did not
     err by instructing the jury with CALCRIM No. 1193.

7

8    (ECF No. 30-13 at 24-26.)

9          To obtain federal habeas relief for a jury instructional error, petitioner must show that the

10   error "so infected the entire trial that the resulting conviction violates due process." See Estelle,

11   502 U.S. at 72. Where an ambiguous or potentially defective instruction is at issue, the Court

12   must ask whether there is a "reasonable likelihood" that the jury applied the challenged

13   instruction in a way that violated the constitution. See id. Moreover, the instruction must be

14   evaluated in the light of the instructions as a whole and the entire trial record. See id. A "slight

15   possibility" that the jury misapplied the instruction is not sufficient. Weeks v. Angelone, 528 U.S.

16   225, 236 (2000).

17         Here, the jury was not instructed to use Dr. Carmichael's testimony as proof that a crime

18   had occurred or that K.D. was telling the truth. Rather, the jury was instructed to use the CSAAS

19   evidence only to evaluate K.D.'s conduct in relation to her credibility. The prosecutor's closing

20   argument characterized CSAAS evidence as "an educational tool" to provide the jury with "an

21   understanding of how kids may . . . act if they have been abused." The Court finds that the state

22   court's rejection of this claim was not an unreasonable application of federal law. Petitioner's jury

23   instruction claim should be denied.

24         C.   Claim Three:  Ineffective Assistance as to CSAAS Testimony

25         Petitioner claims that her trial counsel was ineffective for failing to object to hypothetical

26   questions asked of CSAAS expert Dr. Carmichael that impermissibly mirrored the facts of the

27   case. Petitioner contends that, had defense counsel objected, multiple portions of Dr Carmichael's

28   testimony would have been excluded, likely changing the outcome at trial.

1      Dr. Carmichael testified that he had not reviewed any reports involving the particular case

2  at issue. (ECF No. 31-5 at 67.) He testified about the five components of CSAAS, starting with

3  secrecy. The prosecutor questioned him as follows:

4          Q: For example, can the perpetrator say, *This is our secret* or *Don't
           tell anyone. This is private business between us?*
5
           A: That can absolutely happen.
6

7  (ECF No. 31-5 at 55.) Petitioner contends that defense counsel should have objected, as this

8  paraphrased K.D.'s interview statement that petitioner and Richard told her not to tell anyone

9  because "it's supposed to be private." 2 CT 519.

10     Dr. Carmichael also testified about helplessness, entrapment, and accommodation.

11  Portions of this testimony were similar to events K.D. described in the SAFE interview. Petitioner

12  claims defense counsel was ineffective for failing to object to such testimony.

13     The California Court of Appeal issued the last reasoned state court decision addressing

14  this claim. The California Court of Appeal denied this claim for the following reasons:

15                  *Defendants' Attorneys Were Not Ineffective*

16          It is improper for an expert to testify about accommodation syndrome
           in a manner that directly coincides with the facts of the case. (People
17         v. Bowker (1988) 203 Cal.App.3d 385, 394; People v. Roscoe (1985)
           168 Cal.App.3d 1093, 1099-1100 [expert testimony must be limited
18         to a discussion of victims as a class; the expert must not discuss the
           witness in the case].) It is error to admit an accommodation syndrome
19         expert's response to hypothetical questions that closely track the
           facts of the case. (People v. Jeff (1988) 204 Cal.App.3d 309, 337-
20         339.) For instance, in Jeff, two experts for the prosecution testified:
           the first described the victim's symptoms based on interviews with
21         the victim, and the second described child molest syndrome. The
           prosecution prefaced the testimony in the opening statement by
22         stating that the second expert would tell the jury " 'what these
           symptoms mean.' " (Id. at p. 338.) The prosecution then asked the
23         second expert a series of hypothetical questions that incorporated
           "the exact same facts and details" as those in the allegations against
24         the defendant. (Ibid.) The expert explained the victim's "emotions,
           fears, and reactions to others are symptoms exhibited by a child
25         molest victim." (Ibid.) The Court of Appeal held this evidence
           inadmissible because the expert's testimony "told the jury that [it]
26         should accept" the victim's version of events. (Ibid.)

27          Based on this authority, defendants argue their attorneys were
           ineffective for failing to object to several improper hypothetical
28         questions posed by the prosecutor to the accommodation syndrome

                                      21

expert. To establish ineffective assistance of counsel, defendants must show that: (1) their attorneys' performances fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performances prejudiced defendants. (<u>Strickland v. Washington</u> (1984) 466 U.S. 668, 687-689.) Courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" (<u>Id.</u> at p. 689 [80 L.Ed.2d at p. 694].)

Defendants have not met their burden to show their attorneys were ineffective. First, the prosecution did not present any expert testimony based on interviews or examinations of the victim. The accommodation syndrome expert testified he had never interviewed the victim or any other witnesses in the case; he had never been told the facts of the case; and he had never reviewed any police reports or other materials related to the case. Second, while the challenged hypothetical questions generally bore similarities to the victim's situation, neither the questions nor the expert's responses tracked the victim's conduct so closely that the evidence "told the jury" it should believe the victim's allegations. Third, the expert specifically testified that the elements of accommodation syndrome could not be "used in the reverse order" to say that if a child is displaying that conduct then the child must have been abused. He emphasized that accommodation syndrome is "not a diagnostic tool." Thus, we perceive no error in the prosecutor's questions and no error in defendants' attorneys' failure to object to them.

(ECF No. 30-13 at 22-24.)

"The Sixth Amendment guarantees criminal defendants the effective assistance of counsel." <u>Yarborough v. Gentry</u>, 540 U.S. 1, 4 (2003) (per curiam); <u>see also</u> <u>Missouri v. Frye</u>, 566 U.S. 134, 138 (2012) ("The right to counsel is the right to effective assistance of counsel."). To prevail on an ineffective assistance of counsel claim, a defendant must show that (1) his counsel's performance was deficient, falling below an objective standard of reasonableness, and (2) his counsel's deficient performance prejudiced the defense. <u>Strickland v. Washington</u>, 466 U.S. 668, 687-88 (1984). To establish deficient performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" <u>Id.</u> at 689 (citation omitted). To establish prejudice, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A

1  reasonable probability is a probability sufficient to undermine confidence in the outcome."

2  Strickland, 466 U.S. at 694. However, the Court need not determine whether counsel's

3  performance was deficient before examining the prejudice the alleged deficiencies caused

4  petitioner. See Smith v. Robbins, 528 U.S. 259, 286 n.14 (2000) ("'If it is easier to dispose of an

5  ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be

6  followed.'" (quoting Strickland, 466 U.S. at 697)).

7       "The standards created by Strickland and § 2254(d) are both 'highly deferential,' and

8  when the two apply in tandem, review is 'doubly' so."  Richter, 562 U.S. at 105 (internal citations

9  omitted). When § 2254(d) applies, the "question is whether there is any reasonable argument that

10  counsel satisfied Strickland's deferential standard."  Richter, 562 U.S. at 105.

11       Here, petitioner has not shown deficient performance. As the Court of Appeal determined

12  on review, neither the prosecutor's hypothetical questions nor Dr. Carmichael's testimony ran

13  afoul of the limits on CSAAS testimony imposed by state law. Dr. Carmichael testified that he

14  had not read any reports of K.D.'s allegations or other materials in the case, so any resemblance

15  between his testimony about CSAAS factors and K.D.'s statements or conduct was inadvertent.

16  The prosecutor's questions did not closely track the evidence the case; they did not mention

17  parents or step-parents, for example, nor K.D.'s age at the time of the alleged events. Petitioner

18  has not shown that the challenged hypotheticals were improper or that defense counsel's

19  objections would likely have been sustained. Moreover, "reasonably competent counsel might

20  have had many valid reasons for failing to object," such as not wanting to draw attention to the

21  similarities between the CSAAS factors and K.D.'s statements about what occurred. See

22  Clabourne v. Lewis, 64 F.3d 1373, 1383 (9th Cir. 1995). Nor has petitioner shown that, if certain

23  portions of Dr. Carmichael's testimony on the CSAAS factors had been excluded, the outcome of

24  trial likely would have been different. Petitioner is not entitled to federal habeas relief on this

25  claim.

26       D.  Claim Four: Prosecutor Misconduct in Closing Argument

27       Petitioner claims that the prosecutor committed prejudicial misconduct in her closing

28  argument by saying "you don't give a child molester the benefit of the doubt" when discussing

1   the burden of proof. The relevant portion of the state's closing argument is as follows:

2           So it is about [K.D.], and actions do speak louder than words, *and
            you don't give a child molester the benefit of the doubt. You don't.*

3

4           There was a lot of talk about the burden of proof and presumption of
            innocence. Absolutely. The burden of proof is on the people. The
5           People have to prove to you that these charges have been committed
            by those defendants beyond a reasonable doubt. Beyond a reasonable
6           doubt. Not beyond all doubt. Beyond a reasonable doubt. Without
            speculation. With looking at the evidence. With deciding what the
            facts are, because you are those judges of the facts.
7

8   (ECF No. 31-7 at 197) (emphasis added). Defendant argues that this claim is procedurally barred[7]

9   and, alternatively, fails on the merits.

10          On appeal, petitioner and her co-defendant claimed their attorneys were ineffective for

11  failing to object to these statements in the closing argument. In the last reasoned decision on the

12  ineffective assistance claim (which addresses the prosecutor's statements challenged in the instant

13  claim)[8], the Court of Appeal denied the claim as follows:

14                          *Counsel Was Not Ineffective*

15          Defendants contend their attorneys were ineffective for failing to
            object during the prosecutor's rebuttal argument when discussing the
16          victim's actions speaking louder than her words. The prosecutor
            concluded the discussion as follows: "So it is about [the victim], and
17          actions do speak louder than words, and you don't give a child
            molester the benefit of the doubt. You don't." The prosecutor then
18          spoke of the burden of proof: "The burden of proof is on the People.
            The People have to prove to you that these charges have been
19          committed by those defendants beyond a reasonable doubt. Beyond

20  ───────────────────

21  [7] Federal courts generally refuse to hear claims that were defaulted in state court "pursuant to an
    independent and adequate state procedural rule." Coleman v. Thompson, 501 U.S. 722, 750
22  (1991); accord Shinn v. Ramirez, 596 U.S. 366, 371 (2022) ("A federal habeas court generally
    may consider a state prisoner's federal claim only if he has first presented that claim to the state
23  court in accordance with state procedures."). The Court need not address that argument because,
    even on its merits, this claims fails.
24

25  [8] Petitioner argues that the Court of Appeal did not "address the prosecutorial misconduct issue
    except as a subclaim of [the] ineffective assistance of counsel claim" and, therefore, the Court
26  should review that claim de novo. (ECF No. 34 at 14.) See Pirtle v. Morgan, 313 F.3d 1160, 1167
    (9th Cir. 2002) ("[W]hen it is clear that a state court has not reached the merits of a properly raised
27  issue, we must review it de novo."). However, the Court of Appeal considered the key issue:
    whether plaintiff was prejudiced by the challenged closing statement. Thus, AEDPA review is
28  warranted.

                                        24

1   a reasonable doubt. Not beyond all doubt. Beyond a reasonable
2   doubt. Without speculation. With looking at the evidence. With
    deciding what the facts are, because you are those judges of the
    facts." Such argument, defendants contend, amounted to a prejudicial
3   misstatement of the burden of proof, requiring reversal.

4   We can dispose of defendants' claim on prejudice grounds. (See
5   People v. Kirkpatrick (1994) 7 Cal.4th 988, 1008 [when it is easier
    to dispose of an ineffective assistance of counsel claim on lack of
    prejudice grounds, it is not proper to do so without first determining
6   whether counsel's performance was deficient].) Although the
    prosecutor's statement may have been inappropriate, the jury was
7   properly instructed on the reasonable doubt standard (CALCRIM
    No. 220) and on the jurors' duty to follow the law as stated by the
8   court and to disregard any conflicting law stated by the attorneys
    during argument (CALCRIM No. 200). We presume the jury
9   followed these instructions. (See People v. Smith, supra, 40 Cal.4th
    at p. 517.) Further, the prosecutor's statement was fleeting and
10  immediately followed by a proper explanation of the burden of proof.
    That is: "The burden of proof is on the People. The People have to
11  prove to you that these charges have been committed by those
    defendants beyond a reasonable doubt. Beyond a reasonable doubt.
12  Not beyond all doubt. Beyond a reasonable doubt. Without
    speculation." Defendants' attorneys were not ineffective.
13

14  (ECF No. 30-13 at 29-30.)

15       The controlling Supreme Court precedent governing prosecutorial misconduct claims is

16  Darden v. Wainwright, 477 U.S. 168 (1986). Under Darden, it can be misconduct for prosecutors

17  to manipulate or misstate the evidence or law during closing arguments. See id. at 180-82. Even

18  so, such misconduct cannot violate the Constitution unless the errant statements "so infected the

19  trial with unfairness as to make the resulting conviction a denial of due process." Id. at 181. That

20  is because the "touchstone of due process analysis in cases of alleged prosecutorial misconduct is

21  the fairness of the trial, not the culpability of the prosecutor." Smith v. Phillips, 455 U.S. 209, 219

22  (1982). Even if a prosecutor's remarks were improper, the dispositive question under Darden is

23  whether those remarks were prejudicial. See Ford v. Perry, 999 F.3d 1214, 1225-26 (9th Cir.

24  2021). If there was no "reasonable probability" of a different result without the prosecutorial

25  misstatements, Darden provides no basis for relief. Deck v. Jenkins, 814 F.3d 954, 979 (9th Cir.

26  2016).

27       Here, the last reasoned state court decision was not an unreasonable application of

28  Darden. Under Darden, "the arguments of counsel . . . must be judged in the context in which

25

1   they are made." <u>Boyde v. California</u>, 494 U.S. 370, 385 (1990) (citing <u>Darden</u>, 477 U.S. 168)

2   (other citations omitted). The state appeals court considered the context of the challenged closing

3   statement, which was "fleeting" and followed by an explanation of the burden of proof. The

4   appellate court also considered that the jury was properly instructed on the reasonable doubt

5   standard, and determined that petitioner had not shown prejudice.

6        Even assuming *arguendo* that the prosecutor committed misconduct, petitioner has not

7   shown that the challenged statement "so infected the trial with unfairness as to make the resulting

8   conviction a denial of due process." Ample evidence supported petitioner's conviction, as K.D.

9   testified in detail about her experiences with petitioner and Richard when she was five and six

10   years old. In addition, the jury was properly instructed on the reasonable doubt standard,

11   Petitioner has not shown she is entitled to federal habeas relief for closing remarks by the

12   prosecutor, and this claim should be denied.

13        E.  <u>Claim Five: Prosecutor Misconduct for Failing to Disclose Brady Material</u>

14        Petitioner claims that the prosecutor violated her right to due process under <u>Brady v.</u>

15   <u>Maryland</u>, 373 U.S. 83 (1963) by failing to disclose whether K.D.'s father, Jeffrey Mace, had

16   been threatened with prosecution if he did not return to California with K.D. to testify.

17        On Thursday, October 11, 2018, when the trial court was addressing pretrial motions in

18   limine, Mace and K.D. had not arrived in California for the trial. Defense counsel sought to admit

19   evidence that Mace "fled to South Dakota with [K.D.] in September for the express purpose of

20   preventing [K.D.] from testifying in this case[.]"  (ECF No. 31-3 at 79.) Defense counsel

21   theorized that Mace did not want K.D. to testify because the case was based on "false

22   allegations."  (ECF No. 31-3 at 81.)

23        However, the following Monday, Mace and K.D. were in Sacramento, ready to testify.

24   Defense counsel argued as follows:

25          There is a warrant still active for Mr. Mace's arrest. He is not
         presently in custody.

26

27          . . .

28          At this point we believe . . . that Detective Lamb went to South
         Dakota to personally secure the attendance of [Mace and K.D.] and

1            mostly likely brought [them] back on an airplane. I am wondering if
he was brought back in handcuffs since the order for the arrest is still
2            out there, and . . . was not to be set aside until Mr. Mace showed up
at a hearing today in . . . family court.

3

            We have no idea what happened over the weekend that allowed the
4            DA to secure her witness . . . I would like a 402 hearing.[9] I would
like to know what Detective Lamb said, if anything, to Mr. Mace to
5            convince him to come back with [K.D.]. I think that is <u>Brady</u>
material[.]

6

7    (ECF No. 31-3 at 128-129.) The prosecutor stated that she could "guarantee this Court that

8    Detective Lamb had absolutely nothing to do with Mr. Mace and [K.D.] returning to California."

9    (ECF No. 31-3 at 129.) The trial court accepted the prosecutor's representation and declined to

10   hold a § 402 hearing on the matter. (ECF No. 31-3 at 130.)

11          At trial, Mace testified that he had custody of K.D. and that she lived in South Dakota

12   with him, his wife, and their infant son. (ECF No. 31-4 at 118-119.)  He testified that he did not

13   travel back to California for a family court hearing in Sacramento in September 2018 and

14   subsequently learned there was a warrant for his arrest for failure to appear. (ECF No. 31-4 at

15   141-142.) Mace testified that he had since appeared in family court and the warrant had been

16   rescinded. (ECF No. 31-4 at 142.)

17          On cross-examination, Mace again acknowledged that a bench warrant was issued for his

18   arrest due to his failure to appear in family court in September 2018. (ECF No. 31-4 at 170.)

19   Mace testified that he was flown back to California "by the DA's office," and the bench warrant

20   was recalled when he attended a family law hearing on October 12, 2018. (ECF No. 31-4 at 171.)

21          After the trial, on September 23, 2021, Mace filed a declaration in the family law case

22   concerning custody of K.D., stating in part: "I was forced against my wishes and against what I

23   believe to be my child's best interest to return to California under threat of prosecution." (ECF

24   No. 20-6 at 1-2).

25          Petitioner characterizes Mace's unwillingness to return to California with K.D. except

26

27   [9] California courts conduct § 402 hearings outside the presence of the jury to decide preliminary
questions of fact upon which the admissibility of evidence depends. <u>People v. Superior Court</u>
28   (<u>Blakely</u>), 60 Cal. App. 4th 202, 209 n.6 (1997); Cal. Evid.Code § 402(b).

1 under "threat of prosecution," as exculpatory Brady evidence. In her state habeas petition,

2 petitioner claimed that the trial court prejudicially denied a defense request for a § 402 hearing

3 concerning the production of exculpatory evidence under Brady. (ECF No. 31-16; see ECF No.

4 20 at 10.)  The Superior Court denied all petitioner's habeas claims in a reasoned opinion, and the

5 state Court of Appeal and Supreme Court subsequently denied them without comment.

6          The government has an obligation to surrender favorable evidence that is "material either

7 to guilt or to punishment," even if the defendant does not request disclosure of such evidence.

8 Brady, 373 U.S. at 87. To establish a Brady violation, the defendant must show that the favorable

9 evidence was suppressed by the state, either willfully or inadvertently, resulting in prejudice.

10 Morris v. Ylst, 447 F.3d 735, 741 (9th Cir. 2006). Both exculpatory and impeachment evidence

11 may be favorable to the accused under the Brady standard. United States v. Bagley, 473 U.S. 667,

12 676 (1985); Benn v. Lambert, 283 F.3d 1040, 1052 (9th Cir. 2002). Evidence is material "if there

13 is a reasonable probability that, had the evidence been disclosed to the defense, the result of the

14 proceeding would have been different." Bagley, 473 U.S. at 682 (citation omitted). Where the

15 undisclosed impeachment evidence would have provided no independent basis for impeaching the

16 witness separate from evidence already known to and utilized by the defense, no Brady violation

17 will be found. United States v. Kohring, 637 F.3d 895, 908 (9th Cir. 2011).

18          Here, to the extent petitioner challenges the trial court's decision not to hold a § 402

19 evidentiary hearing, she does not raise a constitutional claim subject to federal habeas review. A

20 federal writ is not available for alleged error in the interpretation or application of state law.

21 Estelle, 502 U.S. at 67-68. Moreover, in her federal petition, petitioner argues that the *prosecutor*

22 committed misconduct by failing to disclose Brady material, whereas the state petition argued

23 that the *trial court* erred in failing to hold a § 402 hearing on "possible Brady material."  (ECF

24 No. 31-16 at 9.)  Insofar as petitioner asserts a new and unexhausted claim, it is not cognizable on

25 federal habeas review.

26          Even if petitioner's Brady claim against the prosecutor is cognizable, she has not shown

27 prejudice. The allegedly undisclosed information that Mace returned to California with K.D.

28 under threat of arrest is largely the same information Mace provided in trial testimony. He

1  testified that there was a bench warrant for his arrest in family court, which he discharged by

2  returning to California in October 2018. Mace further testified that the District Attorney's office

3  paid for him and K.D. to fly back to California in time for petitioner's and Richard's criminal

4  trial. It is not clear what additional information about Mace's and K.D.'s return to California for

5  trial would have provided an "independent basis" for impeachment. Similarly, petitioner has not

6  shown that, had the prosecutor disclosed additional information about Mace's and K.D.'s return

7  to California, the trial result would have been different, as the state's case centered on K.D.'s

8  credibility about past events, regardless of why Mace brought her back to testify. The state courts'

9  rejection of this claim was not contrary to nor an unreasonable application of clearly established

10  federal law, and petitioner is not entitled to relief on her Brady claim.

11     F.  Claim Six: 91-Year Sentence is Cruel and Unusual

12          Lastly, petitioner claims that her sentence of 91 years to life constitutes cruel and unusual

13  punishment under the Eighth Amendment. As noted above, petitioner was convicted of multiple

14  counts of child sexual abuse that occurred between 2015 and 2017, when the victim was five and

15  six years old. (See ECF No. 31-17 at 2.) Petitioner was sentenced to a determinate term of 16

16  years and an indeterminate term of 75 years to life. (ECF No. 31-1 at 95.)

17          On habeas review, the Superior Court denied petitioner's Eighth Amendment claim in a

18  reasoned opinion. (ECF No. 31-17.) The Court of Appeal and state Supreme Court denied the

19  claim as well. (ECF Nos. 30-19 & 30-21.)

20          The Eighth Amendment's cruel and unusual punishment clause "prohibits not only

21  barbaric punishments, but also sentences that are disproportionate to the crime committed."

22  Solem v. Helm, 463 U.S. 277, 284 (1983). Yet, "[t]he Eighth Amendment does not require strict

23  proportionality between crime and sentence. Rather, it forbids only extreme sentences that are

24  'grossly disproportionate' to the crime." Harmelin v. Michigan, 501 U.S. 957, 1001 (1991)

25  (Kennedy, J., concurring) (quoting Solem, 463 U.S. at 288, 303). "Outside the context of capital

26  punishment, successful challenges to the proportionality of particular sentences have been

27  exceedingly rare." Rummel v. Estelle, 445 U.S. 263, 272 (1980). The Supreme Court instructs:

28  "[A] court's proportionality analysis under the Eighth Amendment should be guided by objective

1  criteria, including (i) the gravity of the offense and the harshness of the penalty; (ii) the sentences

2  imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for

3  commission of the same crime in other jurisdictions." Solem, 463 U.S. at 292.

4      Here, as in a similar case where a federal habeas petitioner was sentenced to a term of 125

5  years to life, "[w]hile the sentence imposed . . . is undoubtedly severe, the offenses Petitioner was

6  found guilty of were both numerous and quite grave." Arcasi v. Allison, 2022 WL 1138212, at

7  *18 (S.D. Cal. Apr. 18, 2022). Petitioner's convictions "were not the result of a single isolated

8  incident"; they "took place over the course of . . . years and inflicted great harm to [the victim]"';

9  and they were "committed against a child aged 10 years or younger." Id. "Given the multitude

10  and gravity of the offenses at issue here," the court reasoned in Arcasi, it "cannot conclude

11  Petitioner's is one of the 'rare' cases in which the sentence imposed is 'grossly disproportionate'

12  to the crimes.'" Id. (citing Rummel, 445 U.S. at 272; Solem, 463 U.S. at 288). Similarly, here,

13  given the numerous serious crimes against petitioner's young child, petitioner has not shown that

14  her sentence is grossly disproportionate. The state courts' rejection of this claim was not contrary

15  to nor an unreasonable application of clearly established federal law, and petitioner's Eighth

16  Amendment claim should be denied.

17  V.    CONCLUSION

18      Accordingly, IT IS HEREBY RECOMMENDED that petitioner's amended petition for

19  writ of habeas corpus (ECF No. 20) be denied.

20      These findings and recommendations are submitted to the United States District Judge

21  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days

22  after being served with these findings and recommendations, any party may file written

23  objections with the court and serve a copy on all parties. Such a document should be captioned

24  "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections,

25  he shall also address whether a certificate of appealability should issue and, if so, why, and as to

26  which issues. A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the

27  applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C.

28  § 2253(c)(3). Any response to the objections shall be filed and served within fourteen days after

30

service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

Dated: December 15, 2025

CHI SOO KIM
UNITED STATES MAGISTRATE JUDGE

6/gosz22cv900.157.csk

31